UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cory E. Fisherman, | Case No. 21-cv-2406 (JWB/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| David Launderville, et al., | |
| Defendant. | |

Plaintiff Cory E. Fisherman, a prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983 generally alleging that defendants David Launderville and Patrick Barnum used excessive force against him on June 14, 2021,[1] and that defendant Christine Pawelk retaliated against him by placing him in the Step-Down Management Program (SDMP) at the Minnesota prison in Oak Park Heights (MCF-OPH). [Dkt. No. 1] Plaintiff is proceeding *pro se*. This matter is currently before the Court on Defendants' Motion for Summary Judgment. [Dkt. No. 30] Having reviewed the Defendants' submissions in support of the summary judgment motion, [Dkt. Nos. 31-41 & 43], and Plaintiff's reply, [Dkt. No. 42], this Court recommends the motion be granted in part and denied in part.

## BACKGROUND

On June 14, 2021, Corrections Officer Barnum was working at MCF-OPH when he and Officer Kevan Berg were instructed to escort Plaintiff from his cell in Complex 5 to a cell in the administrative control unit ("ACU"). [Dkt. No. 32 at ¶ 3] Plaintiff was housed

---

[1] It appears that Plaintiff spells Officer Barnum's name incorrectly in the Complaint. [Dkt. No. 1] Consequently, Officer Barnum's name is spelled incorrectly as "Burnum" in the case caption. For clarity, this Court uses the proper spelling of his name throughout this report and recommendation: "Barnum."

in Complex 5, the second most restrictive unit at MCF-OPH, following an incident in which he threatened staff in the education unit. [Dkt. No. 34 at ¶ 5] Plaintiff was being moved to the ACU, the most restrictive unit at the facility, because prison "staff found an edged weapon, or shank" in his cell approximately two days earlier. [*Id.*]

The primary purpose of the ACU is to "separate incarcerated individuals from the general population when necessary to ensure safety, security and the orderly operation of the facility." *Id.* An offender being escorted to the ACU must first submit to an unclothed body search to ensure that he "does not have anything on his person that he could use to harm staff, other inmates, or himself while being escorted." [Dkt. No. 32 at ¶ 3] After Plaintiff refused Officer Barnum's directives to comply with the unclothed search, Officer Barnum stopped attempting to complete the search and Officer Berg initiated an Incident Command System ("ICS") at 12:12 pm. [*Id.* at ¶¶ 3-4] An ICS informs prison staff "of an emergent situation and that extra resources are required" to address that situation. [*Id.* at ¶ 4] The prison's "A-Team"—staff specifically trained to address emergent situations at the prison—responded to the ICS. [*Id.*]; [Dkt. No. 33 at ¶ 3] Officers Barnum and Launderville are members of the A-Team. [Dkt. No. 32 at ¶ 1]; [Dkt. No. 33 at ¶ 3]. As an A-Team member, Launderville has received specialized training, including use of force techniques authorized by the Department of Corrections. [Dkt. No. 33 at ¶ 3]

When the A-Team arrived, Officer Barnum initially stepped aside because he felt Plaintiff was directing his anger at him. [Dkt. No. 32 at ¶ 4] Staff then directed Plaintiff to get on his knees and place his hands through the cell door's "book pass" so that his hands could be restrained. [Dkt. No. 33 at ¶ 5] According to DOC policy, offenders must be restrained in handcuffs when being escorted to the ACU "to ensure the safety of staff and other individuals." [Dkt. No. 34 at ¶ 8] Because the "book pass" is in the middle-lower half

2

of Plaintiff's cell door, Plaintiff needed to get on his knees to be able to put his hands through the book pass. [Dkt. No. 33 at ¶ 5] Plaintiff eventually complied, and his hands were restrained through the book pass. [*Id.*] After his hands were restrained, staff instructed Plaintiff to remain on his knees while the cell door opened so that "his movement would be restricted and staff could more easily control his actions." [*Id.*]

At this point, the parties' statements diverge. According to Officer Launderville, Plaintiff tried to stand up as the cell door opened. [*Id.* at ¶ 6] Officer Launderville alleges that after Plaintiff failed to comply with staff directives to get back on his knees, Plaintiff threatened staff and attempted to spit on staff. [*Id.*] To gain Plaintiff's compliance, Launderville claims that he delivered "two common peroneal strikes with [his] knee to [Plaintiff's] leg." [*Id.*] Peroneal strikes is a type of use of force authorized by the Minnesota Department of Corrections. [*Id.*] A "peroneal strike" involves delivering a strike—most commonly with the knee—to the prisoner's peroneal nerve, which is located just above the knee on the outside of the leg. [*Id.*] The purpose of this type of use of force is to temporarily disable the offender's leg. [*Id.*] According to Officer Launderville, delivering the strike had the intended effect, and Plaintiff complied with staff directives to remain on his knees. [*Id.*] Staff then placed a spit mask on Plaintiff to prevent him from spitting on staff, restrained his legs with leg restraints and escorted him to the ACU. [*Id.*] Officer Launderville claims he only delivered two peroneal strikes to Plaintiff's leg and did not strike any other part of Plaintiff's body or kneel on Plaintiff's calves. [*Id.* at ¶ 7]

According to Officer Barnum, as Plaintiff's cell door opened, Plaintiff tried to stand up at which point staff directed him multiple times to return to his knees. [Dkt. No. 32 at ¶ 4] Barnum claims he then returned to Plaintiff's cell door and restrained Plaintiff's hands, which were in the cell door's book pass, "in an attempt to prevent him from

standing up and to otherwise control his movements." [*Id.*] Officer Barnum contends that Plaintiff was argumentative during the incident and made several threats to staff, including telling him that he had a "shank coming" his way. [*Id.*] Officer Barnum and Officer Doug White escorted Plaintiff to the ACU after leg restraints had been applied. [*Id.*] Officer Barnum claims he did not restrain Plaintiff's hands in an attempt to injure or harm him and did not kneel on Plaintiff's calves or use any force aside from restraining his hands. [*Id.* at ¶ 5]

According to Plaintiff, Officer Launderville used his knee to strike his body and face and Officer Barnum kneeled on his calves so badly that it cut into his calves. [Dkt. No. 1 at 5] Although not entirely clear, Plaintiff appears to claim that while his hands were in handcuffs, staff forced him to stand up, causing blood to appear. [*Id.*]

The video of the incident does little to assist the Court in reconciling these competing narratives. The video shows that Plaintiff's cell is the last—and perhaps only—cell down a very short hallway, immediately past Plaintiff's cell is a closed door to another area of the prison. [Dkt. No. 40] The videographer is standing at the end of the hallway across from an open door that leads to the staircase, pointing the camera in the direction of Plaintiff's cell. [*Id.*] The beginning of the video shows Officer Launderville joining Officer Barnum and Officer Berg outside of Plaintiff's cell. [*Id.* at 0:23]. At minute 1:25 Officer Barnum walks out of sight of the camera, as additional—unidentified—officers arrive and congregate outside of Plaintiff's cell. [*Id.* at 1:25] Officer Launderville continues to talk Plaintiff through the unclothed search. When Officer Launderville finishes the search, the officers appear ready to open Plainiff's cell door. At one point, Officer Launderville directs Plaintiff to turn on his light, [*Id.* at 3:30], and Plaintiff appears to respond, asking, "Why?". [*Id.*]

4

Before the officers open Plaintiff's cell door, Officer Launderville switches places with a different—unknown—officer, who is now directly in front of Plaintiff's cell door. As the officers prepare to open the door, this officer is already directing Plaintiff to remain on his knees. [*Id.* at 5:00-5:30]. When the door opens, it swings in the camera's direction, blocking the camera's view of what is happening directly behind the cell door. [*Id.*] The video, however, continues to capture the audio. Immediately as the door begins to open, an officer can be heard saying, "No, down, down on your knees." [*Id.* at 5:37-5:50]. A struggle ensues shortly thereafter involving unnamed officers, Officer Launderville, and Plaintiff. The video captures someone's knee going into Plaintiff's knees, but it is unclear whose. [*Id.* at 6:00-6:17]. Plaintiff can be heard exclaiming that he was kneed in the face. [*Id.*] At one point, officers switch spots again. Someone else is heard directing Plaintiff to "stop resisting." [*Id.* at 6:20] Officer Barnum returns in view of the camera at minute 6:28 and then takes over holding Plaintiff's hands through the book pass. [*Id.* at 6:28] At no point is Officer Barnum viewed on the other side of the door or on or near Plaintiff's knees.

The video also captures Plaintiff being escorted to his cell at ACU. [*Id.* at 9:00-15:00] After staff leave him in his cell, someone from medical arrives and asks him if he has "any medical concerns related to the ICS." [*Id.* at 15:50] The video shows Plaintiff pointing to his wrists and medical staff offers a band-aid. [*Id.* at 15:50-16:35] After additional, unintelligible conversation, medical staff offers him a band-aid, again, but Plaintiff does not take one. [*Id.*]

After Plaintiff was moved to ACU, Officer Launderville and Plaintiff's caseworker, Kelly McElroy, referred him to the SDMP. [Dkt. No. 35 at ¶ 10] Any staff member may refer a prisoner to the SDMP. [*Id.* at ¶ 4] An offender's placement in SDMP is not punitive. [*Id.* at ¶ 3] According to DOC, the purpose of SDMP is to "ensure that certain offenders

in restrictive housing who present an increased risk to the safety, security, or orderly operation of the facility can gradually transition back to the general population or the community." [Dkt. No. 35-1 at 1] Once a referral to the program has been made, "mental health staff complete a screening to evaluate whether the individual has potential for self-harm if he continues to reside in restrictive housing and whether the individual's behavior may be more appropriately treated through alternative interventions or programming." [Dkt. No. 34 at ¶ 4] If mental health staff conclude that SDMP is appropriate for a particular offender, then the SDMP team convenes to make a recommendation about whether that person is an appropriate fit for the program. [*Id.*] The incarcerated individual is invited to provide his input. [*Id.*] If the SDMP team determines that the individual's behavior qualifies him for placement in SDMP, the team may recommend placement to the DOC's Deputy Commissioner. [*Id.*] The Deputy Commissioner then determines if there is adequate justification to place the individual in SDMP. [*Id.*] Once this decision is made, it is not subject to appeal or grievance. [*Id.*]

SDMP consists of five levels. [*Id.* at ¶ 5] The first level ("step 0") is the most restrictive. [*Id.*] As the incarcerated individual demonstrates his readiness to rejoin general population, he progresses to the next "step" in the program, earning additional privileges. [*Id.* at ¶¶ 5-9] Step 0 lasts no more than 15 days. [*Id.* at ¶ 5] All other steps are reviewed every 30 days to determine whether the individual is ready to proceed to the next, less restrictive level. [*Id.* at ¶¶ 5-9]

Christine Pawelk, the Associate Warden of Operations (AWO) at MCF-OPH, was a member of the SDMP team that reviewed Plaintiff's referral for placement in the SDMP. [*Id.* at ¶¶ 1, 12] The SDMP team reviewed Plaintiff's referral to the program on September 2, 2021. [*Id.* at ¶ 12] Plaintiff also met with the SDMP team. [*Id.*] After reviewing the

6

referral and Plaintiff's prison disciplinary history, which starts in 2004 and includes conduct such as assault on an inmate, destruction of property, lying and misrepresentation, and disobeying a direct order, [Dkt. No. 35-1 at pp.14-27], the SDMP referred him to step 2 of the program. [Dkt. No. 35-1 at pp. 28-29]  Although Plaintiff evidently did not meet the criteria for an "automatic placement" in SDMP, the SDMP team nevertheless made the recommendation based on "the combination of several same/similar incidents and his behavior toward the ACU staff during his current SEG sentence." [*Id.* at p. 29]  Deputy Commissioner Michelle Smith approved this recommendation. [Dkt. No. 35 at ¶ 13] Plaintiff's progress through the program was reviewed monthly and each month he progressed to the next step. [*Id.* at ¶ 14].  The SDMP Team recommended that he be removed from the program for successfully completing it in December 2021. [*Id.*]  Deputy Commissioner Smith approved this recommendation, as well, and Plaintiff was then removed from SDMP. [*Id.*]

Plaintiff claims that after the June 14, 2021, incident, Defendant Christine Pawelk retaliated against him by denying him release from segregation and requiring him to remain in segregation until she said it was "ok" for him to be released. [Dkt. No. 1 at p. 5]

## DISCUSSION

### I. Summary Judgment Standard

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986)). A fact is material only when its resolution would affect the outcome of a case. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001). In response, the nonmoving party "may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). In considering a summary judgment motion, the court views all the evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. In the context of prisoner litigation, moreover, for the purposes of summary judgment, a plaintiff's "verified complaint is the equivalent of an affidavit for the purpose of summary judgment." *Watson v. Jones*, 980 F.2d 1165, 1166 (8th Cir. 1992).

## II. Excessive Force

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The "unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Prison officials confronted with a prison disturbance "must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 6. Accordingly, 'the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.*

In conducting this inquiry, courts consider "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted, from which inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of form as is tantamount to a knowing willingness that it occur." *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017) (quoting *Whitley*, 475 U.S. at 321). The United States Court of Appeals for the Eighth Circuit has described this as a "highly deferential standard." *Id.* "It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.* (quoting *Whitely*, 475 U.S. at 322).

### A. Alleged excessive Force by Officer Barnum

The record shows that Officer Launderville and Officer Barnum's use of force while removing Plaintiff from his cell on Complex 5 so that he could be escorted to ACU, the most secure housing unit in MCF-OPH, does not violate the Eighth Amendment's prohibition on cruel and unusual punishment. Defendant Barnum claims that Plaintiff was being moved to ACU because staff recently found a "shank" in his cell. [Dkt. No. 32 at ¶ 34]. He further claims that Plaintiff initially did not cooperate with the unclothed search prior to this move, which precipitated the ICS. [Dkt. No. 32 at ¶ 4] Finally, Defendant Barnum claims that Plaintiff was combative during the cell extraction and made several threats to staff, including threats that he was going to "get them or stab them." [Dkt. No. 32 at ¶ 4]. Plaintiff does not rebut these facts. Accordingly, this Court considers these facts undisputed for the purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

As to Plaintiff's allegation against Officer Barnum—i.e. that Officer Barnam kneeled on his calves—this allegation is directly controverted by video evidence. [Dkt. No. 40]. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In this case, although the video does not conclusively show what happened behind Plaintiff's cell door, the video does conclusively show Officer Barnum's involvement in this incident because he is always in view of the camera. *See generally* [Dkt. No. 40]. And the video, moreover, shows that Officer Barnum restrained Plaintiff's hands through the book pass and did not, contrary to Plaintiff's claims, kneel on his calves. On this record, no reasonable jury would believe that Officer Barnum kneeled on Plaintiff's calves. Accordingly, this Court recommends granting summary judgment as to this claim.

### B. Alleged excessive force by Officer Launderville

Plaintiff's claims against Officer Launderville, however, are another matter. Plaintiff alleges Officer Launderville kneed him in his body and face. [Dkt. No. 1 at 5]. Plaintiff's complaint is somewhat muddled, but is to be construed liberally, as any pro se complaint, and all reasonable inferences must be drawn in Plaintiff's favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (citing and quoting cases); *Anderson*, 477 U.S. at 255. Here, Plaintiff clearly alleges that Officer Launderville kneed him three times to the body and three times to the face. [Dkt. No. 1 at 5]. What is less clear, but reasonably implied in Plaintiff's complaint, is that Officer Launderville applied this force *after* Plaintiff was restrained. *Id.* (Allegations that he was handcuffed and "defenseless" to the blows). Officer Launderville, by contrast, maintains that he only "delivered two

10

common peroneal strikes with [his] knee to [Plaintiff's] leg." [Dkt. No. 33 at ¶ 7]. The video does not resolve this fact dispute, which the Court finds to be material. If a jury accepts Plaintiff's version of the events—that Officer Launderville kneed Plaintiff six times while he was restrained, they could reasonably find the force used to be "malicious and sadistic, for the purpose of causing harm."

That Plaintiff suffered relatively de minimis injury from this altercation, declining any medical attention, including a band-aid, [Dkt. No. 40, 15:50-16:34]; *see Hudson*, 503 U.S. at 7, does not conclusively demonstrate the force used did not violate the Eighth amendment, given the allegations. ("The absence of serious injury is [] relevant to the Eighth Amendment inquiry, but does not end it."); *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006) (concluding that because some reasonable force was required to arrest Plaintiff, "his relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that support the conclusion" that the defendant did not use excessive force). Viewed in the light most favorable to Plaintiff, this Court finds that a reasonable jury could conclude that Officer Launderville's use of force on June 14, 2021 was applied "maliciously and sadistically for the very purpose of causing harm" and not "in a good faith effort to maintain or restore discipline."

Nor on this record can the Court find that Officer Launderville is entitled to official immunity. *See, e.g.*, *Munz v. Michael*, 28 F.3d 795, 800 (8th Cir. 1994) (affirming district court's finding that "the law is clearly established . . . that an officer is not entitled to beat a bound prisoner in jail . . . and . . . would know as much"); *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009) ("it was clearly established that the use of this type of gratuitous force [kicking and punching several times] against a suspect who is handcuffed, not

11

resisting, and fully subdued is objectively unreasonable"). Accordingly, the Court recommends denying Officer Launderville's motion for summary judgment.

### III. Retaliation

Turning now to Plaintiff's retaliation claim, this Court recommends granting summary judgment in favor of Defendant Christine Pawelk. To prevail on a § 1983 retaliation claim, Plaintiff must show: "(1) he engaged in a constitutionally protected activity; (2) a defendant took adverse action that would chill a person of ordinary firmness from continuing in that activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Webb v. Johnson*, 4:21CV3042, 2021 WL 2002712, at * 5 (D. Neb. May 19, 2021) (citing *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020)). "Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Nei v. Dooley*, 372 F.3d 1003, 1007 (8th Cir. 2004).

Here, Plaintiff's retaliation claim does not pass the first factor. Indeed, Plaintiff's claim is entirely conclusory. He does not allege any facts identifying what activity Defendant Christine Pawelk was allegedly retaliating against, nor how that unspecified activity is constitutionally protected. Such wholly conclusory statements devoid of any specific factual allegations are not sufficient to defeat a summary judgment motion. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 882 (8th Cir. 2005) ("Conclusory affidavits, standing alone, cannot create a genuine issue of material fact, precluding summary judgment.") (citing *Rose-Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998)).

Further detrimental to this claim, moreover, is that Plaintiff names Christine Pawelk as a defendant, alleging that she placed him in SDMP, and he could not get out of the

program until she let him out. [Dkt. No. 1 at p. 5]. To establish liability against officials in their individual capacity, however, "the plaintiff must show that the official, acting under color of state law caused the deprivation of a federal right." *Handt v. Lynch,* 681 F.3d 939, 943 (8th Cir. 2012) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)); *see also Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights."). Put another way, it is not sufficient for a plaintiff seeking relief from a defendant in her individual capacity to allege that his rights were violated; the plaintiff must instead allege that his rights were violated *by the defendant.* Even if Plaintiff established a viable cause of action for retaliation, Plaintiff has not established that Christine Pawelk was responsible for the alleged violation of his rights because it is undisputed that the DOC Deputy Commissioner—and not the defendant—makes the decision about when someone enters and completes the SDMP program.[2]

Plaintiff's claim against Christine Pawelk in her "official capacity" is similarly unavailing. "A suit against a government official in his or her official capacity is another way of pleading an action against an entity of which an officer is an agent." *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 n.55 (1978)). However, "[n]either a state nor its officials acting in their official capacities are 'persons' under § 1983" when sued for money damages. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, state officials, such as Christine Pawelk, may only be sued in their official capacities for prospective injunctive relief. *Ex*

---

[2] Plaintiff does not rebut the allegation that the DOC Deputy Commissioner makes the final decision about whether an offender is placed in SDMP and also makes the final decision about whether that offender has met the criteria to be discharged from it. [Dkt. No. 35 at ¶¶ 4, 9]. Accordingly, the Court considers this fact undisputed for the purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

*parte Young*, 209 U.S. 123, 157-60 (1908); *Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8th Cir. 1995) ("*Ex parte Young* recognized that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law."). But prospective injunctive relief is no remedy here because it is undisputed that Plaintiff is no longer participating in the SDMP program at MCF-OPH that he has successfully completed. [Dkt. No. 35 at ¶ 14]

Accordingly, this Court recommends granting summary judgment as to Plaintiff's retaliation claim, as well.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS that: Defendants' Motion for Summary Judgment [Dkt. No. 30] be **GRANTED** as to Plaintiff's claims against Officer Barnum and Defendant Pawelk and **DENIED** as to OfficerLaunderville.

Dated: January 31, 2023                          ___s/David T. Schultz_____
                                                                                   DAVID T. SCHULTZ
                                                                                   U.S. Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).